**In re Peter KITCHIN, Debtor.**

**Robert Troost, et al., Plaintiffs**

**v.**

**Peter Kitchin, Defendant.**

**Bankruptcy No. 01 B 17814.
Adversary No. 03 A 01204.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 25, 2005.

Jared M. Wayne, Shefsky & Froelich, Ltd., Chicago, IL, Bruce L. Wald, Tishler

& Wald, Chicago, IL, Attorney for Movant or Plaintiff.

Howard L. Adelman, Esq., Adelman, Gettleman, Merens, Berish & Carter, Chicago, IL, Attorney for Respondent or Defendant.

Ronald R. Peterson, Jenner & Block, LLC, Chicago, IL, David P. Leibowitz, Steven R. Rappin, Hauselman & Rappin, Ltd., Chicago, IL, Patrick J. Sherlock, Law Office of Patrick J. Sherlock, Chicago, IL, Office of the U.S. Trustee, Trustee or Other Attorneys.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION FOR SANCTIONS

JACK B. SCHMETTERER,
Bankruptcy Judge.

This Adversary proceeding relates to the Chapter 7 Bankruptcy case filed by Peter T. Kitchin who was sued herein ("Debtor" or "Defendant"). The Adversary was filed March 28, 2002. On December 1, 2003, Plaintiffs Robert Troost ("Troost"), Mount Hope Cemetery Association, Inc. ("Mount Hope"), and Hope Carmel L.L.C. (the "LLC") filed their Second Amended Complaint herein seeking to determine dischargeability of an alleged debt pursuant to 11 U.S.C. § 523 and also objecting to the Debtor's discharge pursuant to 11 U.S.C. § 727. During the course of discovery and on the eve of trial, Plaintiffs voluntarily dismissed their Second Amended Complaint with prejudice, but jurisdiction was reserved over the pending motions of Defendant for sanctions.

The Debtor/Defendant moved for sanctions and related relief pursuant to Fed. R. Bankr.P. 9011, 28 U.S.C. § 1927, and 11 U.S.C. § 105. He contends that Plaintiffs filed this Adversary proceeding for an improper purpose, namely to delay the Debtor's bankruptcy case; and also that factual contentions in paragraphs 16, 17, and 26 through 30 of the Second Amended Complaint lacked evidentiary support and contained legal contentions unwarranted by existing law. Debtor further asserts that these same issues, and also the extended and hard-fought prosecution of this suit for 27 months until dismissal by Plaintiffs on eve of trial, further support an award of fees and costs under 28 U.S.C. § 1927 and 11 U.S.C. § 105.

For reasons stated below, the Debtor's motion for sanctions under Fed. R. Bankr.P. 9011 is denied. The Debtor has, however, demonstrated sufficient facts to establish possible right to award sanctions under 28 U.S.C. § 1927, or alternatively under 11 U.S.C. § 105, contingent on the opportunity of both sides to offer further evidence and argument. This matter will be set for a further hearing to establish in detail the amount of movants' claim for sanctions under § 1927, and then to allow responsive evidence and argument from Plaintiffs on these matters.

## BACKGROUND AND PROCEDURAL HISTORY

Debtor Peter T. Kitchin and Plaintiff Robert Troost are sophisticated businessmen active in the real estate market. The Debtor is a contractor, developer, and owns several subchapter S corporations that provide contracting services. Troost operates cemeteries, owns several pieces of real estate, and is the principal of Plaintiff Mount Hope Cemetery Association.

From 1994 to 1999, Troost and the Debtor participated in a number of real estate ventures. The Debtor functioned as a type of real estate broker; he would find potentially lucrative pieces of real estate to purchase and receive a commission. Troost would provide investment funds.

In 1998, the Debtor notified Troost of an investment opportunity in certain real property in Mokena, Illinois, consisting of a shopping plaza and an office building. Troost, Mount Hope and the Debtor's wife, Carmel Kitchin, an entity controlled by Carmel Kitchin, Carmel Investments, Inc. ("CII") formed Plaintiff Hope Carmel L.L.C. to purchase these properties. Mount Hope, the entity controlled by Troost, held a fifty percent interest in the LLC. CII; controlled by Carmel Kitchin, also held a fifty percent interest. The Debtor managed the properties and provided contracting services. Troost handled the financial affairs.

By 1999, the relationship between the Debtor and Troost deteriorated, and the parties sought to sell their interests in the Mokena properties. Buyers were located, contracts to sell were executed and earnest money deposited but the parties disagreed as to the purchase price, terms of the sale, and the buyer. They eventually resolved their differences in a Settlement Meeting held August 30th, 2000. The parties agreed to consummate the sale of the Plaza and Office Building. The Plaza was sold but the Office Building was not, prompting the would be buyer to file suit in state court to enforce the sales contract.

The Second Amended Complaint alleged that the Debtor engaged in a scheme to defraud Troost in the sale of the Mokena Properties. Specifically, it alleged that (1) Debtor orally misrepresented to Troost at the Settlement Meeting that the Office Building was worth $4 million, with the intent of inducing Troost, Mount Hope, and the LLC into accepting Gateway's offer to purchase the Office Building at below market value; and (2) Debtor committed embezzlement, defalcation, and fraud in his capacity as a fiduciary of the Mokena Properties by fraudulently converting earnest money for his own use.

The parties commenced discovery. On the eve of trial Plaintiffs moved to dismiss the Second Amended Complaint with prejudice, prompting the Debtor to file the instant sanctions motion. Debtor moves for sanctions based on paragraph 16 and paragraphs 26 through 30 of the Second Amended Adversarial Complaint. Paragraph 16 related to a purported oral representation made by the Debtor as to the value of an Office Building and paragraphs 26 through 30 related to the Debtor's alleged misappropriation of earnest money paid in connection with sale of the Mokena Properties.

Paragraph 16 stated:

16. On August 30, 2000, the Debtor, as Troost's business partner and the person to whom Troost entrusted the management and sale of the Mokena Properties, orally misrepresented to Troost that the Office Building was worth $4 million with the intent of inducing Troost, Mt. Hope, and Hope Carmel into accepting a proposal by Gateway to purchase the Office Building at the below-market price of $4 million. The representation that the Office Building was worth $4 million, made by the Debtor to his business partner, was false and the Debtor knew it was false at the time it was made because the Debtor knew at that time that the Office Building was actually worth far in excess of $4 million, although the exact value of the Office Building in August of 2000 is not presently known as discovery has not been completed in his case and expert opinions have yet to be elicited or disclosed on the subject of the historical value of the Office Building.

Paragraphs 26–30 stated:

26. In January 2000, the Debtor arranged a purported agreement for the purchase of the Plaza which required payment by the prospective purchasers of $100,000.00 in earnest money to Hope Carmel.

27. In January 2000, Troost, Mt. Hope, and Hope Carmel relied on the Debtor in his position of trust as manager of the Mokena Properties in the Hope Carmel venture by entrusting the Debtor with the $100,000 earnest money payment from the prospective purchasers of the Plaza.

28. In January 2000, the Debtor, while managing and holding the Mokena Properties in trust for Hope Carmel and holding the $200,000 in earnest money in trust in his capacity as manager of the Mokena Properties, fraudulently converted $50,000 of the $100,000 earnest funds for his own use.

29. The diversion of $50,000 of the earnest money funds was not disclosed to Hope Carmel, Troost, or Mt. Hope and was made strictly for Debtor's personal benefit.

30. As a direct and proximate result of the Debtor's defalcation while acting in a fiduciary capacity and embezzlement of $50,000 of the earnest money funds, Troost, Mt. Hope, and Hope Carmel were damaged in the amount of $50,000.

Evidence was taken on the sanction motion as to Paragraphs 16 and 26 through 30 of the Second Amended Complaint, and the history of this Adversary was reviewed. Following trial on the sanction motion, closing arguments were submitted in writing. Based on the pleadings and admissions, court records as to history of this Adversary proceeding, submissions of the parties and evidence adduced at trial of the sanction motion, it is found and concluded for reasons stated below that the Debtor's sanction motion under Fed. R. Bankr.P. 9011 should be denied but relief may yet be considered pursuant to 11 U.S.C. § 1927 or alternatively 11 U.S.C. § 105.

## FINDINGS OF FACT

### Troost's and Kitchin's Relationship

1. Robert Troost ("Troost") is a cemeterian and real estate owner. He owns approximately eight cemeteries and five monument/memorial businesses, including approximately sixteen outlets. (Def.'s Ex. 26; Troost Tr. 11/30/04 at 69–70.) [1] Troost also owns, personally or through various entities, an industrial building in Villa Park, Illinois, a condominium in Florida and shopping plazas in Schaumburg and La Grange Park, Illinois. (Def.'s Ex. 26 at 8; 9–12; Troost Tr. 11/30/04 at 69–70.)

2. Peter Kitchin is a real estate developer, general contractor and holds interests in entities that provide contracting services. (P. Kitchin Tr. 11/29/04 at 90; Def.'s Ex. 3; Second Am. Compl. ¶ 5; Answ. ¶ 5.)

3. Kitchin first met Troost in 1994 and from 1994 to 1999 they were involved in a number of real estate ventures whereby Kitchin would locate real estate and offer Troost an opportunity to invest. (P. Kitchin Tr. 11/29/04 at 147–148, 168; Second Am. Compl. ¶ 6; Answ. ¶ 6.) During this period, Kitchin and Troost acquired ownership interests in several entities that owned real estate. (Def.'s Ex. 26 at 16.)

---

1. "Tr." refers to the trial transcript date and pages of the witness referred to. "Pl.s' Ex." and "Def.'s Ex." refer to Plaintiffs' and Defendant's document admitted into evidence at trial.

### Robert Troost and Carmel Kitchin Form the LLC

4. In 1998, Kitchin informed Troost of an investment opportunity in certain real property in Mokena, Illinois, consisting of a shopping plaza commonly known as 19081 Old LaGrange Road, Mokena, Illinois (the "Plaza"), and an office building commonly known as 19001 Old LaGrange Road, Mokena, Illinois (the "Office Building") (collectively, the "Mokena Properties"). (P. Kitchin Tr. 11/29/04 at 149–150; Def.'s Ex. 2.)

5. Thereafter, Mount Hope Cemetery Association, Inc., one of the Plaintiffs herein ("Mount Hope"), and Carmel Investments, Inc. ("CII"), agreed to form a partnership to purchase and develop the Mokena Properties. (Def.'s Ex. 1, Second Am. Compl. ¶ 8; Answ. ¶ 8.) Troost holds an interest in, and controls, Mount Hope. Carmel Kitchin, the Debtor's wife, is the sole shareholder of CII. Debtor holds a general power of attorney executed by Carmel Kitchin, which gave the Debtor substantial authority to perform and act on Carmel Kitchin's behalf individually and through various entities, including *inter alia* CII. (Second Am. Compl. ¶ 5; Answ. ¶ 5.)

6. Troost, Mount Hope, CII, and Carmel Kitchin memorialized the terms of the partnership agreement on May 15, 1998 (the "Partnership Agreement"). (Def.'s Ex. 1.) Under the Partnership Agreement, Troost and Mount Hope agreed to provide certain financial accommodations to purchase the Mokena Properties. Both Troost and Carmel Kitchin committed: (a) to obtain a loan in an amount sufficient to finance the acquisition and tenanting of the Mokena Properties in the total amount of $7,741,640.90; (b) to guaranty such financing; and (c) to each be responsible for fifty percent of the obligations related to the Mokena Properties, including any financing obligations. (Def.'s Ex. 1.)

7. In 1998, Carmel Kitchin and Troost, through Mount Hope, formed Hope Carmel LLC (the "LLC") to purchase and manage the Mokena Properties. Troost is the managing member of the LLC. (Def.'s Ex. 3.) Carmel Kitchin and Mount Hope each hold fifty percent of the ownership interests of the LLC. (Def.'s Ex. 1; Troost Tr. 11/30/04 at 71, Second Am. Compl. ¶ 10; Answ. ¶ 10.)

8. Mount Hope and Carmel Kitchin placed title to the Mokena Properties in trust under Trust Agreement dated May 28, 1998 and known as Trust No. 1105980. The trust was the legal titleholder to the Mokena Properties. (Salk Tr. 11/29/04 at 18–20; P. Kitchin Tr. 11/29/04 at 98; Def.'s Ex. 8.)

9. Troost, through Mount Hope, and Carmel Kitchin each held a fifty percent interest in the trust. (P. Kitchin Tr. 11/29/04 at 98.) The Trust Agreement required the joint signatures of Troost and Carmel Kitchin to authorize any conveyance of the Mokena Properties. (Salk Tr. 11/29/04 at 19.)

### Kitchin's Duties Relating to the Mokena Properties

10. On or about May 29, 1998, Carmel Kitchin, Troost, Mount Hope, the LLC and the Debtor entered into an agreement whereby the Debtor and certain of his subchapter S corporations agreed to manage and perform contracting services for the Mokena Properties ("Management Agreement"). (Def.'s Ex. 2; P. Kitchin Tr. 11/29/04 at 92; Second Am. Compl. ¶ 9; Answ. ¶ 9.)

11. The Management Agreement also provided that the Debtor would receive a commission for locating the Mokena Properties and facilitating an agreement between CII and Mount Hope. (Def.'s Ex. 2.)

### Troost's Duties Relating to the Mokena Properties

12. Sometime in 1999, Troost assumed responsibility for the financial affairs of the LLC. (Troost Tr. 11/30/04 at 78.) Troost tracked the LLC's income; paid its expenses; maintained its checkbook; signed all checks for the LLC; and kept possession of all of its books and records, including cancelled checks, bank statements, receipts and disbursements. (Troost Tr. 11/30/04 at 76–78, 80.) Troost reviewed the LLC's financial statements and provided information to the LLC's accountants for tax purposes. (Troost Tr. 11/30/04 at 70.) Troost also kept a written ledger of the LLC's transactions. (Troost Tr. 11/30104 at 81.)

13. The Debtor testified that Troost prevented him from seeing the LLC's books.

### Gateway Contract

14. Troost invested approximately 1.7 million in the Mokena Properties, but by January 1999, came to believe they were a bad investment. Kitchin subsequently found a buyer for the Mokena Properties, a company called Gateway Services of Illinois, Inc. ("Gateway"). (Troost Tr. 11/30/04 at 92; P. Kitchin Tr. 11/29/04 99–100.)

### Kitchin's Conflict of Interest in the Gateway Transaction

15. The owner of Gateway, Mr. William Danahy ("Danahy"), was a close friend of the Debtor. Danahy appointed the Debtor his attorney in fact in connection with the purchase of the Mokena Properties. (Def.'s Ex. 46.) The Debtor testified that he disclosed this conflict of interest verbally and in writing to Troost, a fact Troost denies. (See Def.'s Ex. 46; P. Kitchin Tr. 11/29/04 at 134–5; Troost Tr. 11/30/04 at 91.) Moreover, Danahy opened a banking account in 1998 that named Carmel Kitch-

in as beneficiary. That account remained active through April 2000. (Second Am. Compl. ¶ 17; Answ. ¶ 17.)

### Contract to Sell the Plaza and Modification of the Gateway Contract

16. On or about November 17, 1999, Gateway and the LLC entered into a contract in which Gateway agreed to purchase Mount Hope's beneficial interest in the Office Building and Plaza ("Gateway Contract"). (Def.'s Ex. 5.)

17. In December 1999 or January 2000 Ivan Cico ("Cico") and Bryan Hanson ("Hanson") expressed their interest in purchasing the Plaza.

18. On or about January 19, 2000, the LLC executed an additional agreement whereby the LLC agreed to sell only the Plaza to Cico and Hanson for $4.2 million ("Plaza Contract"). (Def.'s Ex. 4.) Troost testified that he never signed the Plaza Contract but found the terms of the contract to be acceptable and agreed to the sale. (Def.'s Ex. 26 at 92; Troost Tr. 11/30/04 at 112; Def.'s Ex. 36 at 28–29.)

19. In June or July 2000, Mount Hope and Gateway Carmel Kitchin subsequently modified the Gateway Contract ("Modified Gateway Contract") so that Gateway would purchase Mount Hope's fifty percent interest in the Office Building for $4,000,000. (Def.'s Ex. 6.)

20. The Debtor signed the Modified Gateway Contract on Gateway's behalf. (Def.'s Ex. 6; Pls.' Ex. 4; P. Kitchin Tr. 11/30/04 at 17; Def.'s Ex. 36 at 29–30.) Troost reviewed and executed the Modified Sales Contract on behalf of Mount Hope. (Troost Tr. 11/30/04 at 90, 93; Def.'s Ex. 6.)

21. The Modified Gateway Contract and the Plaza Contract increased the purchase price of the Mokena Properties to $8.2 million; $4 million for the Office Building and $4.2 million for the Plaza.

22. At the time Troost executed the Modified Sales Contract, he was a signatory to the LLC's bank account and was in possession of its books, records, ledgers, tax returns, checkbook and financial statements. (Def.'s Ex. 36 at 31–32.) Troost also had direct knowledge of all the leases, rental income and expenses of the Mokena Properties. (Def.'s Ex. 36 at 33.)

### Facts Relating to Alleged Misappropriation of the Earnest Funds

23. Cico and Hanson agreed under the Plaza Contract to provide earnest money which would be applied to the Plaza's purchase price. (Def.'s Ex. 4 ¶ 3.) The Plaza Contract further provided that "the earnest money shall be held by Seller's attorney for the mutual benefit of the parties." (Def.'s Ex. 4, Conditions and Stip. ¶ 7.)

24. Cico and Hanson deposited a total of $100,000 in earnest money in two separate installments in January and March of 2000. (Def.'s Exs. 4, 24 and 45; P. Kitchin Tr. 11/29/04 at 124.)

25. On or about January 19, 2000 Infinity Property Management tendered a $50,000 check payable to Patrick J. O'Malley "as escrowee" representing the first installment of the earnest money. (Def.'s Ex. 24, KB000600.) Kitchin testified that this check was delivered to Patrick O'Malley ("O'Malley"), his attorney, and he never took possession of it. (P. Kitchin Tr. 11/29/04 at 124–5.)

26. On or about March 28, 2000, the Debtor received two checks representing the second installment of earnest money. Cico tendered to Kitchin a cashier's check for $25,000 payable to "Peter Kitchin." Landmark Management, Inc. tendered a $25,000 check payable to "Hope Carmel."

27. Cico and Hanson personally delivered these checks to Kitchin at his office in Willowbrook. Kitchin testified that the checks were not prepared in his presence.

28. The Debtor testified that he deposited both checks in a safety box in his office, removed them two weeks later on or about April 15, 2000, and deposited them in his personal account. (P. Kitchin Tr. 11/29/04 at 124–126.) Kitchin then drafted a check of $50,000 to the LLC's listing agent, Realty Executives, to hold in escrow. (P. Kitchin Tr. 11/29/04 at 128.) Kitchin, however, did not produce a copy of this check.

29. Some time after this, Troost became aware that the Debtor misappropriated the earnest money. Troost testified that he first became aware of the Debtor's misappropriation when a real estate broker sent him a copy of one of the $25,000 checks the Debtor deposited into his personal account. (Troost Tr. 11/30/04 at 151–152.)

30. Sometime before July 2000, Troost and the Debtor had a meeting to discuss the return of the earnest money. (Troost Tr. 11/30/04 at 151–152.)

31. At that meeting, Troost showed the Debtor a copy of the check that was deposited into his personal account. The Debtor testified that he does not remember this meeting. (P. Kitchin Tr. 11/29/04 at 143.)

32. At some point in 2000, Cico and Hanson were unable to obtain financing for their purchase of the Plaza. In July 2000, a meeting was held in Peter Kitchin's office to discuss this matter. (Brown Tr. 12/7/04 at 50; Troost Tr. 11/30/04 at 146–148.) Troost, Frank Troost, Brown, the Debtor, Salk, Cico and Hanson, and an attorney representing Cico and Hanson, attended.

33. At that meeting, Cico and Hanson indicated that due to their inability to get financing they wanted their earnest money returned. (Brown Tr. 12/7/04 at 45–6.) The Debtor does not remember this meeting. (P. Kitchin Tr. 11/29/04 at 143.)

34. Troost testified that he asked Cico and Hanson why they made one of the earnest money checks payable to the Debtor and they responded that the Debtor told them to do so. (Troost Tr. 11/30/04 at 159.) The Debtor testified that Cico and Hanson could have believed that he had authority to deposit the checks on behalf of the LLC. (P. Kitchin Tr. 11/29/04 at 141.)

35. In August 2000, Kitchin collected a $50,000 check from O'Malley and from Realty Executives. (Def.'s Ex. 24, KB 000204, KB 000206, KB 000594; Pls.' Ex. 16.) Kitchin then forwarded the checks to the attorneys representing Cico and Hanson representing a return of all the earnest money. (P. Kitchin Tr. 11/29/04 at 132; Def.'s Ex. 38 at 91.)

36. Cico and Hanson's attorney deposited the checks into an escrow account in August of 2000. (Brown Tr. 12/7/04 at 46.) The Debtor states that he returned the earnest money with Troost's permission. (P. Kitchin Tr. 11/29/04 at 129.)

37. Troost admitted that all of the earnest money was properly accounted and returned to Cico and Hanson. (Def.'s Ex. 26 at 97–98.) Troost however, stated that the Debtor illegally maintained possession of the earnest money for approximately one through four months. (Def.'s Ex. 26 at 98; Troost Tr. 11/30/04 at 158.)

### Attempted Financing of the Office Building

38. In early 2000, the Debtor contacted Carroll Financial Group ("Carroll Financial") on Gateway's behalf to give Mr. Danahy an idea of how much money Gateway would need to finance its purchase. (P. Kitchin Tr. 11/29/04 at 172, 176, 178.)

39. The Debtor subsequently retained Carroll Financial as a mortgage broker to secure financing for Gateway's purchase of Troost's and Mount Hope's interest in the Office Building and the refinancing of Car-

mel Kitchin's loans on the Office Building. (Carroll Tr. 12/14/01 at 148; P. Kitchin Tr. 11/29/04 at 172.)

40. In connection with CII and Carmel Kitchin's attempt to refinance their existing loans, Carmel Kitchin and the Debtor provided income and expense statements to Carroll Financial. (Pls.' Ex. 26; P. Kitchin Tr. 11/30/04 at 198; Carmel Kitchin Tr. 12/14/04 at 103.)

### Binder Hypothetical Valuation

41. On February 7, 2000, after execution of the Plaza Contract and Modified Gateway Contract, the Debtor contacted an appraiser named Richard Binder ("Binder") to receive an approximate value of the Office Building. (P. Kitchin Tr. 11/29/04 at 168.) The Debtor required the information provided by Binder in connection with Carmel Kitchin's refinancing and Gateway's purchase.

42. The Debtor asked Binder to determine the hypothetical value of the Office Building if it was 0% vacant and producing a certain amount of rental income per square foot. Binder orally stated to Kitchin that, under the given conditions, the Office Building could be worth $6,000,000 to $6,500,000. (P. Kitchin Tr. 11/29/04 at 168–170).

43. The Debtor never told Troost or Danahy of Binder's hypothetical valuation.

### Alleged Representation of Value at the Settlement Meeting

44. By 1999, Troost became increasingly distrustful and frustrated with his business relationship with the Debtor. (Def.'s Ex. 26 at 62; 77). In addition, a number of disputes had arisen between Troost and Carmel Kitchin regarding the sale of the Mokena Properties. (Def.'s Ex. 8; P. Kitchin Tr. 11/29/04 at 120–122.)

45. Troost and Carmel Kitchin disagreed as to the buyer of the Properties. Troost wanted to sell the Plaza to Cico and

Hanson, but Carmel Kitchin did not agree. (Pls.' Ex. 18, Brown Decl. ¶¶ 5–9; Salk Tr. 11/29/04 at 30; P. Kitchin Tr. 11/29/04 at 120.)

46. Troost and Carmel Kitchin also did not agree on the purchase price of the Plaza. (Salk Tr. 11/29/04 at 30, 60, 76.)

47. Since the Mokena Properties could not be sold without the joint consent of Troost, through Mount Hope, and Carmel Kitchin the two entered into settlement negotiations.

48. Kenneth Brown ("Brown") represented Troost and Mount Hope and other parties with related interests (collectively the "Troost Parties") in the negotiations. (Brown Tr. 11/30/04 at 146.) Bruce Salk ("Salk") represented Carmel Kitchin, the Debtor and two of the Debtor's business entities (collectively the "Kitchin Parties"). (Salk Tr. 11/29/04 at 28; Def.'s Ex. 37 at 74–75.)

49. Both Brown and Salk are experienced real estate attorneys, each with over a twenty years of relevant professional experience. Salk's law practice is concentrated in commercial real estate, and he has advised clients on thousands of real estate transactions over his career. (Salk Tr. 11/29/04 at 17–25.) Similarly, Brown concentrated in real estate, among other areas, for over twenty years (Brown Tr. 12/7/04 at 16), and has advised clients in over one hundred real estate transactions (Def.'s Ex. 37 at 44–45).

50. A meeting was held on August 30, 2000 to attempt to reach an agreement on the terms of the proposed sale of the Mokena Properties ("Settlement Meeting").

51. The Debtor, Brown, Salk, Bill Jones, Troost and his brother Frank Troost attended. (Salk Tr. 11/29/04 at 33; Troost Tr. 11/30/04 at 176.) Carmel Kitchin did not attend.

52. Several days before the Settlement Meeting, Brown and Salk exchanged drafts and revisions of a potential settlement agreement, including proposed language potentially to be included therein. (Def.'s Ex. 10; Brown Tr. 12/7/04 at 82.)

53. The Second Amended Complaint avers that at the Settlement Meeting "the Debtor ... orally misrepresented to Troost that the Office Building was worth $4 million" (Second Am. Compl. ¶ 16.) The Troost and Kitchin parties disagree as to whether the Debtor made a representation of the value of the Office Building.

54. Brown, who represented the Troost parties, testified that during the meeting he asked the Debtor the value of the Office Building and the Debtor responded that he had a verbal appraisal of the Office Building of between $4 and $4.5 million. (Brown Tr. 12/7/04 at 66, 68, 93.) Brown did not take notes at the meeting.

55. Plaintiffs tendered a written declaration given by Brown. In this declaration, Brown declared that "At the August 30, 2000 meeting, Peter Kitchin orally represented to Troost and myself that, based on information he obtained from lenders and a verbal appraisal he had received, the Office Building was worth approximately $4 million to $4.5 million." (Pls' Ex. 18, Brown Decl. ¶ 12.)

56. In a deposition taken in this Adversary, Brown again testified that the Debtor "had a verbal appraisal that the Office Building was worth between four and four-and-a half million dollars." (Def.'s Ex. 38 at 45.)

57. Although Troost attended the meeting he gave conflicting accounts as to whether the Debtor made any representation.

58. In a deposition taken in related State Court Litigation, when asked if the

Debtor ever told him his opinion of the value of the Office Building, Troost did not mention any representation given by the Debtor at the meeting. (Def.'s Ex. 26 at 110–113.)

59. In a deposition in this Adversary, Troost stated that he did not take notes and did not recall much about meeting. (Def.'s Ex. 36 at 61.) During testimony at trial, however, Troost attempted to corroborate Brown's testimony.

60. The Debtor vehemently denies making this statement or any statement relating to the value of the Office Building. (P. Kitchin Tr. 11/29/04 at 123.) In fact, he insisted that no one ever asked his opinion of the value of the Office Building.

61. Salk, who represented the Kitchin parties, Carmel Kitchin, and their related interests, also stated that no one at the meeting made a representation as to the value of the Office Building. (Salk Tr. 11/29/04 at 36.)

### Drafts of Settlement Agreement

62. At the conclusion of the Settlement Meeting, the Troost and Kitchin parties reached a tentative agreement. (Brown Tr. 12/7/04 at 81.)

63. On August 31, 2000, at approximately 11:30 a.m., Brown sent to Salk, via telecopier, a copy of a draft of a potential settlement agreement that included several dozen handwritten comments and/or proposed insertions. (Def.'s Ex. 10; Salk Tr. 11/29/04 at 36.)

64. Brown drafted a proposed insert to be included in a finalized settlement agreement. The insert contained additional proposed terms and provisions. Brown faxed the insert to Salk early in the morning on August 31, 2000. (Def.'s Ex. 12.)

65. Proposed Paragraph 16(a) of the drafted insert stated "Peter Kitchin ('Peter') has obtained a verbal appraisal of the estimated current value of the Office Building is approximately $4,000,000 to $4,500,000." (Def.'s Ex. 12.)

66. Salk reviewed the insert on behalf of the Kitchin Parties and conveyed to Brown that, as was the case during the Meeting, the Debtor explicitly refused to make any of the proposed representations, including a representation as to value. Salk indicated to Brown that the Troost Parties could determine the value of the Office Building on their own and pointed out that the representation "was not made and will not be made." (Salk Tr. 11/29/04 at 43, 44; Brown Tr. 12/7/04 at 105.)

67. Salk thus indicated to Brown that the provisions of the Insert were unacceptable and the Kitchin Parties were unwilling to include the language proposed in the Insert. (Salk Tr. 11/29/04 at 43, 44.)

68. The language proposed in the insert, including paragraph 16(a) was not contained or incorporated anywhere in the finalized agreement executed by the parties. (Def.'s Ex. 8.)

### Terms of the Settlement Agreement

69. On or about August 31, 2000, the Troost parties and the Kitchin parties entered into that certain "Settlement Agreement and Mutual General Release" ("Settlement Agreement"). (Def.'s Ex. 8.) Troost did not particularly like all the terms of the Settlement Agreement but he signed it. (Troost Tr. 11/30/04 at 190; Def.'s Ex. 36 at 57–59.)

70. The Settlement Agreement required in pertinent part: (a) Mount Hope to enter into an amendment to the Gateway Modified Contract selling Mount Hope's interest in the Office Building; (b) Carmel Kitchin to execute a direction to convey the Plaza to the Trustee and authorize Troost to complete the sale of the Plaza for $3.2 million; (c) the Debtor to pay a certain sum to Mount Hope and

deliver a promissory note signed by the Debtor and Carmel Kitchin in the amount of $50,000 upon the first occurrence of (i) the sale of the Office Building to Gateway (or its nominee); (2) the sale by Carmel Kitchin of her interest in the office Building; or (iii) after the sale under the Contract, a subsequent refinance of the Office Building and (d) a release of liability for the Kitchin Parties. (Def.'s Ex. 8 ¶¶ 3–9.)

71. The Settlement Agreement does not contain any reference to an alleged statement or representation of value of the Office Building, or to any purported appraisal of the Office Building obtained by the Debtor or any other party. (Def.'s Ex. 8.)

72. On or about September 4, 2000, Salk received by telecopier the signatures of Troost and the Troost Parties to the Settlement Agreement. (Def.'s Ex. 8.) Upon execution of the Settlement Agreement, no additional terms or conditions or reservations were expressed by Brown on behalf of the Troost Parties. (Salk Tr. 11/29/04 at 45.)

*Attempts to Obtain Financing as Required by the Settlement Agreement*

73. Sometime in May of 2000, Carroll Financial, Carmel Kitchin's and Gateway's mortgage broker, submitted a loan application to Success National Bank ("Success"). Carroll Financial had been retained to secure financing for Gateway's purchase of Troost's and Mount Hope's interest in the Office Building and the refinancing of Carmel Kitchin's loans on the Office Building. (*See* Finding of Fact ¶¶ 36–37.)

74. In connection with the loan application, Success requested financial information from Carmel Kitchin. Carmel Kitchin and the Debtor prepared a Personal Financial Statement for Carmel Kitchin as of May 2000. (Pls.' Ex. 26; Carmel Kitchin Tr. 12/14/04 at 103.) The Personal Financial Statement listed the market value of the office Building as $6,500,000. (Pls.' Ex. 26.)

75. On October 10, 2000 Success issued a commitment letter approving a $4.85 million loan to Gateway, Carmel Kitchin and CII subject to certain terms and conditions. Success requested that an appraisal be performed for the Office Building. (Pls.' Ex. 30; Carmel Kitchin Tr. 12/14/04 at 110.)

76. Carmel Kitchin accepted Success' commitment letter in a letter dated October 24, 2000. That letter stated that Success "agreed to accept $6,800,000 as the appraised value necessary for the required loan amount, $4,850,000." (Pls.' Ex. 10.)

77. Success contacted an appraisal firm, Price & Associates ("Price"), to perform an appraisal of the Office Building. (P. Kitchin Tr. 11/30/04 at 14.) The Debtor and Price executed a contract to complete the appraisal. (Pls.' Ex. 9.)

78. Price performed an appraisal ("Price Appraisal") but Plaintiffs were unable to introduce an authenticated copy into evidence. Plaintiffs' Ex. 13 was admitted only as evidence of a copy of an appraisal contained in Price's archives not for its substantive contents.

79. Price sent an invoice for the appraisal to the Debtor and to Success. (Pls.' Exs. 13 A, 13B.) The representative from Price, Mr. Mike Wolin, did not recall if the appraisal was sent to Success.

80. The Debtor testified that he did not obtain a copy of the appraisal until the after the commencement of the underlying litigation. (P. Kitchin Tr. 11/30/04 at 12–13.) Troost, however, received the Price Appraisal and reviewed it in 2001. (Troost Tr. 12/15/04 at 41, 67.)

81. In September or October 2000, Troost requested that Key Investment & Management, Inc. prepare an appraisal

("Key Appraisal") of the Office Building. (Troost Tr. 12/15/04 at 32–33.) Troost received the Key Appraisal in November. (*See* Pls.' Ex. 21; Troost Tr. 12/15/04 at 34.)

### The Closing of the Plaza Sale and Attempted Closing of the Office Building

82. Pursuant to the Settlement Agreement, Mount Hope agreed to enter into an amended contract with Gateway and "thereafter covenants and agrees to fulfill its obligations and agreements [thereunder]." (Def.'s Ex. 8.)

83. On or about August 31, 2000, Gateway, Mount Hope, and Carmel Kitchin entered into a second amendment to the Gateway Contract ("Second Amended Gateway Contract"). (Def.'s Ex. 7.) The Second Amended Gateway Contract provided that Gateway would purchase Mount Hope's interest in the Office Building at $4 million subject to certain conditions. (Def.'s Ex. 7.)

84. The Second Amended Gateway Contract contains no reference to a representation of value or to any alleged appraisal of the Office Building obtained by the Debtor or any other party or third party. (Def.'s Ex. 7.)

85. Cico and Hanson and Landman ultimately purchased the Plaza for 3.2 million on September 5, 2000. (Brown Tr. 12/7/04 at 51; Def.'s Ex. 38 at 28.)

86. On November 6, 2000, the Troost Parties retained Larry C. Rubin and Shefsky & Froelich Ltd. to represent them in connection with the closing the sale of the Office Building. (Def.'s Ex. 34.)

87. The sale of the Office Building was never consummated. (Def.'s Ex. 36 at 72–73, Second Am. Compl. ¶ 18; Answ. ¶ 18.)

### The Gateway Litigation

88. On March 12, 2001, Gateway filed a Complaint in Illinois state court to enforce the provisions of the Second Amended Gateway Contract. Gateway named Mount Hope and the Chicago Trust Company as Defendants ("State Court Litigation"). (Def.'s Ex. 13.)

89. Gateway requested specific performance of the Amended Sales Contract, and also contained a count for breach of contract. (Def.'s Ex. 13.)

90. Mount Hope subsequently filed a Motion to Join Additional Parties and their First Amended Counterclaim/Third–Party Complaint (the "Counterclaim/Third–Party Complaint"), whereby Troost joined the litigation as a Third–Party Plaintiff, and Carmel Kitchin and CII became Third–Party Defendants. (Def.'s Ex. 14.)

91. The Counterclaim/Third–Party Complaint alleged that the Debtor would have been named a defendant in the Counterclaim/Third–Party Complaint but for the filing of his Chapter 7 Petition. (Def.'s Ex. 14.)

92. On or about October 19, 2004, the state court granted summary judgment in favor of Gateway, Carmel Kitchin and CII, and against Mount Hope and Troost in connection with both the Gateway Complaint and the Counterclaim/Third–Party Complaint. (Def.'s Ex. 15.)

### Bankruptcy Proceedings

93. On March 16, 2001 the Debtor filed a petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code. (Def.'s Ex. 18 at 2.)

94. On July 5, 2001, the U.S. Trustee appointed David P. Leibowitz ("Trustee") as the Chapter 7 Trustee for the bankruptcy case.

95. The Debtor listed Troost and his business entities on Schedule F as holding an unsecured claim in an unknown amount.

96. The Trustee filed a Motion to Extend Time Within Which to Object to Dis-

chargeability of Debt or to Discharge (the "Motion to Extend"). On November 30, 2001, Plaintiffs Troost, Mt. Hope Cemetery, and the LLC moved to adopt that Motion. (*See* Motion to Adopt, Nov. 30, 2001.) An Order was subsequently entered granting those motions and extending the deadline. (*See* Order Extending the Deadline for Complaints Objecting to Discharge or to the Dischargeability of Certain Debts, Dec. 14, 2001.)

97. The Trustee subsequently filed a second Motion to Extend and Plaintiffs similarly moved to adopt the motion. (Motion to Adopt, January 24, 2002.) An Order was entered granted both motions and extending the deadline. (Agreed Order Extending the Deadline for Complaints Objecting to Discharge, January 29, 2002.)

98. The Plaintiffs filed two additional motions, each seeking a six month extension of the deadline to file claims objecting to discharge or dischargeability. An order was entered granting each motion in turn and established April 1, 2003, as the extended deadline to file objections to discharge and dischargeability (the "Objection Deadline"). (Order, October 2, 2002.)

99. On March 28, 2002, Trustee filed a separate Adversarial Complaint against Debtor seeking to bar discharge. Pursuant to 11 U.S.C. § 727. On January 6, 2003 the Trustee filed an Amended Complaint (the "Trustee Complaint"). The Trustee Complaint included three counts objecting to discharge, including Count I pursuant 11 U.S.C. § 727(a)(3), Count II pursuant to 11 U.S.C. § 727(a)(5), and Count III pursuant 11 U.S.C. § 727(a)(2)(A). (Def.'s Ex. 31.)

100. The Trustee eventually dismissed the Amended Complaint with prejudice, pursuant to a settlement agreement in which the Debtor and Carmel Kitchin agreed to pay $65,000. (*See* Motion to Approve Compromise and Settlement of Adversary Complaint, April 1, 2004; Order Approving Compromise and Settlement, April 5, 2004.) However, while it was pending the Plaintiffs pursued their own litigation herein.

101. On the day of the final Objection Deadline, April 1, 2003, the Plaintiffs filed a five count complaint against the Debtor (the "Initial Complaint") seeking a determination that certain debts allegedly owed by the Debtor to the Plaintiffs are non-dischargeable under § 523 and to deny the Debtor a discharge under § 727(a)(3) and § 727(a)(5). (Def.'s Ex. 16.)

### Plaintiffs' Pre–Filing Investigation Into the Allegations of the Complaint

102. Plaintiffs counsel participated in several meetings in which matters relating to the Complaint were discussed with their clients.

103. Plaintiffs' counsel submitted copies of this Complaint and all subsequent Complaints to the Plaintiffs and Brown at or about the time of their filing. (Pls.' Finding of Fact ¶ 58–60.)

104. In March or April 2003, Brown requested that Lawrence A. Debb ("Debb"), a real estate broker for GVA Williams, prepare a market appraisal report of the Office Building in order to obtain an understanding of its value. (Def.'s Ex. 38 at 93–96; Brown Tr. 12/17/04 at 33–34.)

105. Debb conducted an appraisal analysis of the Office Building, and estimated its value as between $3,928,000 and $4,266,000. (Def.'s Ex. 30; Def.'s Ex. 38 at 93–96.)

106. On or about April 25, 2003, Debb forwarded this appraisal to Brown (Def.'s Ex. 30), who in turn sent the appraisal to Lawrence C. Rubin, an attorney at Shefsky & Froelich. (Def.'s Ex. 38 at 96.)

107. Neither Troost or Mount Hope filed a claim in the underlying bankruptcy.

### Defendant's Motions to Dismiss and Subsequent Amendments to the Complaint

108. In May of 2003, the Debtor Defendant moved to dismiss Counts I and II of the Initial Complaint, alleging that it contained only broad, conclusory allegations of fraud in violation of Bankruptcy Rule 7009(b), and made numerous allegations improperly plead upon "information and belief." (Def.'s Mot. to Dismiss, May 12, 2003.)

109. Plaintiffs filed a brief in response. After oral argument on July 21, 2003, an order was entered striking Counts I and II of the Initial Complaint, and granting the Plaintiffs leave to file an amended complaint. (*See* Order Striking Counts I and II, July 25, 2003.)

110. The Plaintiffs then filed an Amended Complaint on August 19, 2003 (the "Amended Complaint"), which alleged the same general scheme of fraud as in the Initial Complaint. (Def.'s Ex. 17.)

111. The Debtor moved to dismiss Counts I and II of the Amended Complaint, arguing that substantive defects of the initial Complaint remained uncured.

112. Upon reviewing the briefs and hearing oral argument on November 10, 2003, an Order was entered striking Counts I and II of the Amended Complaint but again granting leave to amend. (Order, Nov. 10, 2003.)

113. The Plaintiffs filed their Second Amended Complaint on December 1, 2003 (the "Second Amended Complaint"), premised on the same allegations and the same alleged debts presented in the prior two complaints. (Def.'s Ex. 18.)

114. Counts I, II, and III of the Second Amended Complaint sought determination that certain debts owed to Plaintiffs are non-dischargeable under § 523(a)(2)(A), (a)(4) and (a)(6). Counts IV and V allege violations of § 727(a)(3) and under § 727(a)(5). (Def.'s Ex. 18.)

115. Paragraph 19 of the Second Amended Complaint alleged, *inter* alia, "The Debtor is, therefore, indebted to Troost, Mt. Hope and Hope Carmel in an amount in excess of $100,000 in addition to the difference between $4 million and the actual value of the Office Building in August of 2000 due to his fraud while acting in a fiduciary capacity." (Def.'s Ex, 18.)

116. In the Second Amended Complaint the Plaintiffs stated that they did not know "the exact value of the Office Building in August of 2000." The Plaintiffs nonetheless alleged that the Office Building is "actually worth far in excess of $4 million." (Def.'s Ex. 18.)

117. As part of Count II of the Second Amended Complaint, Paragraph 37 re-alleged Paragraphs 1–19 from Count I in their entirety. (Def.'s Ex. 18.)

118. Paragraph 26 of the Second Amended Complaint alleged, "In January, 2000, the Debtor arranged a purported agreement for the purchase of the Plaza which required payment by the prospective purchasers of $100,000 in earnest money to Hope Carmel." (Def.'s Ex. 18.)

119. Paragraph 28 of the Second Amended Complaint alleged, "In January, 2000, the Debtor, while managing and holding the Mokena Properties in trust for Hope Carmel and holding the $200,000 [sic] in earnest money in trust in his capacity as manager of the Mokena Properties, fraudulently converted $50,000 of the $100,000 earnest money funds for his own use." (Def.'s Ex. 18.)

120. Paragraph 30 of the Second Amended Complaint alleged, "As a direct and proximate result of the Debtor's defal-

cation while acting in a fiduciary capacity and embezzlement of $50,000 of the earnest money funds, Troost, Mt. Hope and Hope Carmel were damaged in the amount of $50,000." (Def.'s Ex. 18.)

121. The substance of Paragraphs 16, 17, 19, 26, 28 and 30 of the Second Amended Complaint had also been alleged by Plaintiffs in both the Initial Complaint and the Amended Complaint. (Def.'s Exs. 16, 18.)

122. The substance of Counts I and II of the Initial Complaint, the Amended Complaint and the Second Amended Complaint were also alleged by the Plaintiffs in their Counterclaim/Third–Party Complaint in their state court litigation. (Def.'s Exs. 14, 16–18.)

123. Counts III, IV and V of the Initial Complaint, the Amended Complaint and the Second Amended Complaint are nearly identical to Counts I, II and III of the Trustee's Complaint, containing similar allegations and the same statutory basis for relief. (Def.'s Exs. 16–18, 31.)

124. The Debtor moved to dismiss Counts I and II of the Second Amended Complaint, noting that it remained inadequate under Rule 7009 and also questioning how the Plaintiffs' could legitimately remove all qualifications of allegations as being based upon "information and belief." (*See* Def.'s Mot. to Dismiss Second Am. Compl., Dec. 18, 2003.)

125. After hearing argument, an Order was entered denying Debtor's motion to dismiss Counts I and II, but *sua sponte* ordering pursuant to Fed. R. Bankr.P. 7012 that Plaintiffs file a More Definite Statement as to certain allegations contained in paragraphs 16 and 17 of the Second Amended Complaint. (*See* Order Denying Dismissal of Counts I and II, But Ordering More Definite Statement, January 7, 2004.)

126. Paragraph 16 of the Second Amended Complaint alleged:

On August 30, 2000, the Debtor, as Troost's business partner and the person to whom Troost entrusted the management and sale of the Mokena Properties, **orally misrepresented to Troost that the Office Building was worth $4 million with the intent of inducing Troost, Mt. Hope and Hope Carmel into accepting a proposal by Gateway to purchase the Office Building** at the below-market price of $4 million. The representation that the Office Building was worth $4 million, made by the Debtor to his business partner, was false and the Debtor knew it was false at the time that it was made because the Debtor knew at that time that the Office Building was actually worth far in. excess of $4 million, **although the exact value of the Office Building in August of 2000 is not presently known** as discovery has not been completed in this case and expert opinions have yet to be elicited or disclosed on the subject of the historical value of the Office Building. (Def.'s Ex. 18) (emphasis added).

127. Paragraph 17 of the Second Amended Complaint alleged:

The Debtor made the material misrepresentations regarding the value of the Office Building and the purported armslength nature of the Gateway proposal in his fiduciary capacity as the business partner of Troost and the individual entrusted by Troost, Mt. Hope and Hope Carmel with the management and sale of a the Office Building. **The Debtor made these material misrepresentations with the knowledge that they were false and with the intent to deceive Troost, Mt. Hope and Hope Carmel** into believing that they were entering into an arms-length agreement with Gateway for a fair market price when, in

fact, the Gateway entity was a front for the Debtor himself and $4 million was a below-market price for the Office Building. Therefore, these misrepresentations by the Debtor were made with the intent that Troost, Mt. Hope and Hope Carmel would rely upon them. (Def.'s Ex. 18) (emphasis added).

128. On January 26, 2004, Plaintiffs filed a More Definite Statement in connection with Paragraphs 16 and 17. (Def.'s Ex. 19.)

129. To support the allegations plead in Paragraph 16 Plaintiffs stated:

The allegation in ¶ 16 that the Office Building was worth far in excess of $4 million at the time of the representation was made is based on, inter alia, the following facts . . .

An appraisal prepared on October 29, 1996 by William H. Mertz & Associates, Inc, states (sic) that the Office Building had a value at that time of $4.8 million dollars. This $4.8 million appraisal was prepared nearly four years prior to the Debtor's August 30, 2000 misrepresentation that the Office Building was only worth $4 million. The Plaintiffs believe that discovery and expert opinions on · this matter will likely reveal that the value of the Office Building did not decrease, but rather increased between October 29, 1996 and August 30, 2000. The Plaintiffs purchased the [O]ffice [B]uilding and another property (i.e. The Plaza) in 1998 for a combined purchase price of approximately $7.7. million. The Plaza sold in 2000 for $3.2 million. The Plaintiffs believe that discovery and expert opinions on this matter will likely reveal that the Office Building was worth far in excess of $4 million on August 30, 2000 when the Debtor misrepresented that the Office Building was only worth $4 million. (Def.'s Ex. 19 ¶ 2.)

130. In support of the allegations contained in the More Definite Statement, the Plaintiffs referenced an appraisal performed in 1996. (Def.'s Ex. 19). However, the Plaintiffs did not submit or attempt to submit that Appraisal into evidence during the hearings on the Motion for Sanctions. Plaintiffs did not refer to the Appraisal in the Initial Complaint, the Amended Complaint or the Second Amended Complaint, nor did they allege that the Debtor received and reviewed the Appraisal, or even had any knowledge of its existence at any time. (Def.'s Exs. 16, 18.)

131. On February 9, 2004, the Debtor filed his Combined Amended Answer to Counts I and II of the Second Amended Complaint and Answer to More Definite Statement. (Answ. February 9, 2004.)

132. On February 17, 2004, a Preliminary Pretrial Scheduling Order was entered closing discovery on May 17, 2004 and a Final Pretrial Order was also entered setting the matter for trial on June 21, 22 and 24, 2004.

### Plaintiffs' Discovery Motions

133. On April 6, 2004 the Debtors filed a Motion to Compel Kenneth Brown, Troost's and Mount Hope's attorney, to produce subpoenaed documents. (*See* Debtor's Mot. to Compel, April 6, 2004.) The Debtors alleged that Brown failed to produce subpoenaed documents and failed to contact Debtor's counsel regarding the subpoena. (*Id.* at 11–12.) An Agreed Order was subsequently entered ordering Brown to produce all documents responsive to. the Subpoena. (Agreed Order Scheduling Production of Documents, April 12, 2004.)

134. On May 4, 2004, Debtor moved to compel the deposition testimony of Brown. (*See* Debtor's Mot. to Compel Deposition Testimony From Kenneth Brown, Esquire

and For Sanctions, May 4, 2004.) In support of that Motion, the Debtor cited Brown's disruptive conduct during his deposition including Brown's refusal to answer questions; raising evidentiary objections and questioning the techniques of the interrogator; answering his cell phone during the deposition; and attempting to control the scope and manner of the deposition. (*Id.* Ex. A.) As a result of Brown's conduct, Debtor's counsel terminated the deposition and filed the above Motion.

135. The Debtor sought entry of an order compelling Brown to sit for the duration of his deposition; for an order instructing Brown to provide answers to deposition questions and for sanctions against Brown for his refusal to participate in his deposition. (*See* Motion to Compel Deposition Testimony From Kenneth Brown, Esquire and For Sanctions ¶ 1 at 2.)

136. On May 5, 2004 the Debtor filed a Motion to Compel Plaintiffs to Amend Certain Answers to First Request for Admissions and for Sanctions. That Motion stated that Plaintiffs failed to provide adequate responses to requests to admit propounded by the Debtor.

### Plaintiffs' Voluntary Dismissal

137. By pretrial order entered on February 20, 2004, trial of this case was scheduled to start on June 21, 22 and 24, 2004. On the eve of trial, May 6, 2004, while attending a hearing on three discovery motions filed by the Debtor, Plaintiffs' counsel stated that Plaintiffs would prefer to dismiss the Second Amended Complaint with prejudice rather than respond to outstanding discovery. (Def.'s Ex. 20 at 18.) This was one month after the Trustee dismissed his case. (Finding No. 97.)

138. On May 6, 2004, at the same hearing Debtor's counsel stated his intention to move for sanctions. (Def.'s Ex. 20 at 20.)

139. On May 7, 2004 Plaintiffs counsel reiterated the intention to dismiss this case and to discontinue all discovery. (Def.'s Ex. 21 at 8–10.) Debtor's counsel again stated his intention to move for sanctions. Plaintiffs' counsel responded by requesting that the Court set a date for the Debtor to file a motion for sanctions and to establish a briefing schedule for the same. (Def.'s Ex. 21 at 19–20.) Plaintiffs' counsel expressed their approval of the established procedure on the record and then executed the dismissal Order, thereby affirming the same. (Def.'s Ex. 21 at 21.) By agreement, that Order was entered dismissing Counts 1, 2, and 3 with prejudice on that day. The dismissal Order stated that the "Court reserves jurisdiction to consider any motion by Defendants that is filed, noticed for hearing, and presented in Court on or before July 6, 2004 with respect to assessment of costs, fees, or sanctions pertaining to Counts 1, 2, and 3." (Def.'s Ex. 22.)

140. Since Fed. R. Bankr.P. 7041 and L.R. 7041–1 require a 20 day notice to creditors when an action under 11 U.S.C. § 727 is dismissed, notice of dismissal of Counts 4 and 5 was served on the creditors. During the notice period, the Debtors stated their intention to proceed with discovery and resolve pending discovery motions. Plaintiffs' counsel would not agree to allow discovery to continue. (Def.'s Ex. 21 at 8–10.)

141. After notice and 20 day notice and service of Plaintiff's motion to dismiss the remaining Counts under 11 U.S.C. § 727, an Agreed Order was entered dismissing Counts 4 and 5 with prejudice. (Def.'s Ex. 23.) Plaintiff's case was thereby finally dismissed less than a month before the date set to begin trial. That dismissal Order also stated that the Court reserved jurisdiction to consider any motion by Defendant "with respect to assessment of

costs, fees, or sanctions pertaining to Counts 4 and 5." (Def.'s Ex. 22.)

142. Pursuant to a set briefing schedule, Debtor filed the instant Sanctions Motion on June 14, 2004. Plaintiffs filed a brief in response on July 24, 2004.

143. Following extensive discovery efforts and other preparation by the parties, evidence was taken in November and December of 2004 on the instant sanction motion.

144. Statements of fact contained in the Conclusions of Law section shall constitute additional Findings of Fact.

### *JURISDICTION*

■ A bankruptcy court has core jurisdiction over a motions for sanctions. 28 U.S.C. § 157(a) and § 1334(b). A federal trial court may retain jurisdiction after dismissal of a case for the limited purpose of adjudicating Rule 11 (or Bankruptcy Rule 9011) litigation, as was done here. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Dunn v. Gull*, 990 F.2d 348, 350 (7th Cir.1993). By analogy, jurisdiction may also be retained under that precedent to consider sanction sought under any other authority.

### *DISCUSSION*

#### *Debtor's Counsel Complied with Fed. R. Bankr.P. 9011's Procedural Requirements*

■ Party-initiated sanctions must proceed by motion and satisfy the procedural requirements of Rule 9011(c)(1)(A). The motion must describe the specific conduct alleged to be sanctionable. The motion cannot be made in conjunction with another motion. Fed. R. Bankr.P. 9011. The motion must be served, but not filed or presented to the Court unless, within twenty-one days of service, the non-mov-

ant has not withdrawn or corrected the "challenged paper, claim, defense, contention, allegation, or denial." Fed. R. Bankr.P. 9011(c)(1)(A).

■ A court that imposes sanctions without adhering to these provisions abuses its discretion. *See Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1058 (7th Cir.1998); *Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147, 150–151 (7th Cir.1996) (district court's failure to comply with procedural requirements of amended Rule 11 constitutes an abuse of discretion, requiring sanction to be vacated). Plaintiffs insist that Kitchin failed to follow these necessary requirements and any award of sanctions would be improper.

#### *Plaintiffs Waived the Safe Harbor Provision*

Kitchin orally moved for sanctions before the Court and Plaintiffs' counsel in open court May 6th and 7th, 2004. A briefing schedule was set in which Plaintiffs counsel participated. Kitchin filed a sanctions motion on June 14, 2004, describing in detail conduct it believed to be sanctionable. Kitchin admits that it did not serve same motion within the twenty-one day safe harbor period as the Rule requires. Nonetheless, Kitchin contends that the Plaintiffs waived the safe harbor provisions.

■ Rule 9011 provides, in pertinent part:

> "The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected."

Fed R Bankr.P. 9011. The purpose of the safe harbor provision is to give the offend-

ing party the opportunity, within twenty-one days after service of the motions for sanctions, to withdraw the offending pleading and thereby escape sanctions. *Barber v. Miller,* 146 F.3d 707, 710 (9th Cir.1998); Advisory Committee's Note 1993 Amendments.

Several Courts have found that failure to follow the safe harbor provision requires denial of a sanctions motion. *Elliott v. Tilton,* 64 F.3d 213, 216 (5th Cir.1995); *First Bank of Marietta v. Hartford Underwriters Ins. Co.,* 307 F.3d 501, 510–511, 527–528 (6th Cir.2002); *Weinreich v. Sandhaus,* 156 F.R.D. 60, 63 (S.D.N.Y.1994), *aff'd without opinion,* 60 F.3d 810 (2d Cir.1995); *Mareno v. Jet Aviation of Am., Inc.,* 155 F.R.D. 74, 77 (S.D.N.Y.1994); *United Food & Commercial Workers Union v. Four B Corp.,* 893 F.Supp. 980, 987 (D.Kan.1995). *See also Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995) (reversing sanctions "under all the circumstances, particularly the failure to afford Hadges the 21–day safe-harbor period"); *Radcliffe v. Rainbow Constr. Co.,* 254 F.3d 772, 789 (9th Cir.2001), *cert. denied,* 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001) ("Rainbow did not serve the plaintiffs with the motion in advance of filing and thus did not comply with the 21–day advance service provision. Having not followed this procedure, Rainbow was not entitled to obtain an award from the plaintiffs"); *Martens v. Thomann,* 273 F.3d 159, 178 (2d Cir.2001) (reversing sanctions award where neither separate motion filed nor 21–day safe harbor period honored).

■ Other Courts, however, have held that, under certain circumstances, the safe harbor provision may be waived or forfeited.[2] *Nyer v. Winterthur Int'l,* 290 F.3d 456, 460 (1st Cir.2002) (refusing to consider whether the safe-harbor provisions had been complied with because the issue has not been raised before the district court). A divided panel of the Fourth Circuit held in *Rector v. Approved Federal Savings Bank,* 265 F.3d 248, 253 (4th Cir.2001), that the safe harbor requirement is not jurisdictional and may be waived if not timely raised. Approved Financial Corporation filed a sanctions motion against Edwin Rector ("Rector") and Edwin Rector 1995 Charitable Remainder Trust ("Trust") but did not comply with the safe harbor requirement. Neither Rector nor the Trust objected to the deficient motion to the trial court, on appeal, or upon remand. They raised the issue for the first time on a second appeal, contending that the requirement is a non-waivable jurisdictional rule. *Id.* at 251.

*Rector* held that the safe harbor provision is not jurisdiction, but is similar to a statute of limitation or the doctrine of personal jurisdiction in that both may be waived if not timely asserted:

"a movant filing under Rule 11 must serve the motion at least 21 days before filing it with the court. If the movant files the motion less than 21 days after giving notice, the party against whom the motion is filed may assert the 21–day safe harbor provision as a defense. Should the litigant fail to do so, the defense is waived."

*Id.* at 252–253. Thus, Rector and the Trust's failure to raise the movant's noncompliance with the safe harbor provision

---

**2.** Waiver is the "intentional relinquishment or abandonment of a known right." *In re Kontrick,* 295 F.3d 724, 735 (7th Cir.2002) Forfeiture, on the other hand, is the failure to make the timely assertion of a right. *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.,* 369 F.3d 385, 395 n. 7 (4th Cir.2004) (en banc) (quoting *U.S. v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

in the district court constituted a waiver of this argument. *Id.* at 254.

Sitting *en banc,* the Fourth Circuit reaffirmed *Rector* in *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.,* 369 F.3d 385 (4th Cir.2004) (en banc). Defendants moved for sanctions after summary judgment had been granted in their favor. Brickwood Contractors ("Brickwood") responded to the sanctions motion but did not raise Defendants failure to comply with the safe harbor provisions to the trial court. As in *Rector,* Brickwood raised the issue for the first time on appeal.

The Court in *Brickwood* also concluded that rights under the safe harbor provision could be forfeited. That opinion relied upon the Supreme Court's distinction in *Kontrick v. Ryan,* 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867. 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) between a rule governing subject matter jurisdiction and an inflexible claim-processing rule. *Kontrick,* 540 U.S. at 456, 124 S.Ct. 906, held that rules governing subject matter jurisdiction "cannot be expanded to account for the parties' litigation conduct; a claim-processing rule, on the other hand, even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Brickwood* held that Rule 11 does not implicate a court's subject matter jurisdiction and is more properly characterized as a claim-processing rule subject to forfeiture.

In *Methode Elecs., Inc. v. Adam Techs., Inc.,* 371 F.3d 923 (7th Cir.2004), decided one month after *Brickwood,* a panel of the Seventh Circuit held that it is possible for a party to waive the safe harbor provision.

Methode Electronics ("Methode") filed a complaint containing false venue allegations. Defendants sent Methode a letter warning of a possible sanctions motion if Methode proceeded with the false complaint. Two days later, Defendants orally moved for sanctions. A briefing schedule was set. Methode subsequently voluntarily dismissed its case. The trial judge *sua sponte* set a show cause hearing and subsequently granted Defendants' sanction motion. For the first time on appeal, Methode asserted that Defendants failed to comply with the safe harbor provision.

*Methode* concluded that, under the circumstances, Defendants did what they could to comply with Rule 11. They sent an informal warning letter to Methode, but when Methode proceeded with the hearing, it rejected the warning. And at that point, Defendants had no opportunity to file their motion and were prevented by the speed of events from complying with the safe harbor provisions. *Methode* declined to find waiver or forfeiture, instead affirming the district court's sanction award based on the Court's inherent power. Nevertheless, the opinion is clear that a party may waive its rights to the safe harbor provision. *Id.* at 927 ("[T]here may be a basis in this case for finding . . . [that] Methode waived its rights to the 21–day safe harbor provision.").

The safe harbor provision serves the laudable purpose of requiring litigants to dispose of frivolous claims without judicial involvement. It is therefore in the Court's best interest that the safe harbor provisions should be strictly applied and enforced. *See, e.g. Brickwood,* 369 F.3d at 397–398 (explaining that although party forfeited the safe harbor provisions, ruling in its favor would frustrate the goals underlying the safe-harbor provision.) Yet, based on the above authority, the safe harbor provisions are not absolute and may be waived or forfeited by an inattentive litigant under some circumstances.

In the matter at bar, Kitchin orally moved for sanctions before the Court

thereby putting Plaintiffs on notice of its intent to file a sanctions motion. Notably, Plaintiffs did not raise an objection at any of the hearings or status conferences on the sanctions motion. Plaintiffs did not object when a briefing schedule was set. Rather, Plaintiffs first raised the issue in a reply brief some months later. Plaintiffs failure to press its rights is fatal and it must be concluded that Plaintiffs thereby waived or forfeited its rights to attack the Debtor's compliance with the safe harbor provision.

Equally important, Plaintiffs made clear their intent to forego the safe harbor provisions in a hearing before the Court following agreed dismissal of the suit:

> Plaintiffs Counsel: What I would like on this issue of costs and on the issues of sanctions ... [is that] the court set a date for them to file whatever ... we would like a briefing schedule on that issue ... so we can respond in writing. Court: What I'm going to do is reserve jurisdiction and require that any such applications for assessment of costs, payment of fees, payment of sanctions be noticed, filed and presented here within [60 days].

Plaintiffs did not object or raise the safe harbor issue. In fact, Plaintiffs continued to argue the validity of their Adversarial Complaint, despite its knowledge of a putative sanctions motion. Plaintiffs can not now complain about the loss of the safe harbor provision when it deliberately and knowingly rejected that option. *See Giganti v. Gen–X Strategies, Inc.*, 222 F.R.D. 299, (E.D.Va.2004) ("Plaintiffs never had any intention of withdrawing any of the challenged claims, nor of availing themselves of the protection of the safe harbor provision. Put differently, by choosing to remain steadfast in their support of the offending claims during the hearing on the motion to dismiss, even in the face of

defendants' cited authorities and the Court's suggestion that the RICO and Sherman Act claims might well violate Rule 11, plaintiffs, by counsel, knowingly waived the benefit of the twenty-one day period and knowingly waived any right to complain about loss of no more than approximately five hours of the twenty-one day period.").

### Timeliness of the Sanctions Motion

Plaintiffs assert that since they dismissed their case the Debtor's sanction motion is untimely. However, a potential violation of Rule 9011 is complete when the paper is filed. *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight Inc.*, 809 F.2d 451, 453–454 (7th Cir.1987). This means that sanctions may be awarded whether the plaintiff wins, loses on the merits, or dismisses its own case. *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077–79 (7th Cir.1987) *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229(1988). ("An award of fees under Rule 11 is more like a sanction for contempt of court than like a disposition on the merits ... a lawyer cannot absolve himself of responsibility by dismissing his client's suit."); *Ormsby Motors, Inc v. General Motors Corp.*, 32 F.3d 240, 241 (7th Cir.1994) (holding that a litigant cannot avoid sanctions by voluntarily dismissing the case).

### The Separateness Requirement

A Rule 9011 sanctions motion must be made separate from other requests. *Ridder v. Springfield*, 109 F.3d 288, 294 n. 7 (6th Cir.1997) held that the separate motion requirement is:

> intended to highlight the sanctions request by preventing it from being tacked onto or buried in motions on the merits, such as motions to dismiss or for summary judgment. The requirement does not foreclose combining a Rule 11 re-

quest with other provisions regulating attorney behavior, such as § 1988 and § 1927. To require [movants] to request Rule 11 sanctions separate from other requests for attorney fees based on the same conduct would amount to needless duplication of paper, time, and effort, for practitioners as well as the courts.

██ This reasoning is persuasive and will be adopted here. The Debtor's sanctions motion also seeks relief under § 1927 and § 105 but does not seek relief upon the merits. Rather than require additional time, paper and effort, all requests for relief will be considered here.

### The Debtor has not Proven a Violation of Rule 9011(b)

██ Fed. R. Bankr.P. 9011 provides in pertinent part:

(a) Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name . . . .

(b) Representations to the court

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modifica-

tion, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr.P. 9011(b). A basic purpose of Rule 9011 is to deter baseless filings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). Sanctions may be imposed for any violation of Rule 9011(b). Sanctions may be imposed against both an attorney and the party they represent. *In re Val W. Poterek & Sons, Inc.*, 169 B.R. 896, 909 (Bankr.N.D.Ill.1994). The Debtor contends that Plaintiffs violated Rule 9011(b)(1), (b)(2), and (b)(3).

### Allegations Pleaded in the Second Amended Complaint Did Not Lack some Factual Support

██ Rule 9011(b)(3) requires an attorney to perform a reasonable preliminary investigation of the facts and applicable law before filing a paper. *In re American Telecom*, 319 B.R. at 868. This subdivision contains an objective component, a paper filed in the best of faith is sanctionable if counsel neglected to make a reasonable inquiry beforehand. *Mars Steel Corp.*, 880 F.2d 928 (7th Cir.1989) (en banc); *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir.1987) *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229(1988) (explaining that the objective component is analogous to the tort of abuse of process); *In re Collins*, 250 B.R. 645 (Bankr.N.D.Ill.2000).

Debtor asserts that Plaintiffs knowingly plead Paragraphs 16, accusing the Debtor of making a misrepresentation of the value of the Office Building and Paragraphs 26–30, accusing the Debtor of misappropriating the earnest funds even though they knew these allegations to be false and lacking factual support.

### Alleged Misrepresentation

■ The gravamen of the Plaintiffs' Second Amended Complaint is the Debtor's purported misrepresentation of the value of the office Building at the Settlement Meeting. This alleged misrepresentation is at the center of the fraudulent scheme purportedly hatched by the Debtor and represents the heart of Counts I and II. (Second Am. Compl. ¶ 16.)

Debtor contends that no such representation occurred, citing Plaintiff Troost's uncertain testimony. In related State Court Litigation, when asked if the Debtor ever told him his opinion of the value of the Office Building, Troost did not mention any representation given by the Debtor at the meeting. (Def.'s Ex. 26 at 110–113.) Also, in a deposition in this Adversary, Troost stated that he did not take notes and did not recall much about meeting. (Def.'s Ex. 36 at 61.) During testimony at trial, however, Troost attempted to corroborate Brown's testimony.

A reasonable preliminary investigation by counsel for Plaintiffs could have concluded that without corroboration Troost was not a credible declarant as to events occurring in the Settlement Meeting. Nonetheless, such an investigation could have given credence to the corroborating testimony of Kenneth Brown. Brown, an experienced real estate attorney, testified to the asserted oral misrepresentation at the sanction trial and again in a declaration. The Debtor makes much of the fact that Brown did not take notes during the Settlement Meeting and that Brown's tes-

timony at trial differed slightly from the testimony in his deposition. However, this argument goes to the weight of Brown's testimony, more appropriate for a trial on the merits. For purposes of Rule 9011(b)'s reasonable preliminary investigation standard, Brown's account of the events must be given weight as possibly credible and persuasive in the eyes of Plaintiffs and their counsel.

Brown's account and Troost's testimony contradicted that of the Debtor's attorney witness and of the Debtor who each testified that no representation occurred. The resulting dispute between the parties was inherently factual. Even though Brown's testimony might well have been overcome by the weight of contrary evidence if the trial had been held, his testimony provided some evidentiary support for Plaintiff's pleadings in paragraph 16 of the Adversarial Complaint.

### Alleged Misappropriation of the Earnest Money Funds

■ There was also some evidentiary support for the allegation that the Debtor misappropriated the earnest money funds. The Debtor admitted committing an unauthorized act which could arguably be viewed as converting funds for his own personal use. He admitted receiving two $25,000 checks from Cico and Hanson tendered as earnest money deposits on purchase of the Plaza. One check was made payable to the Debtor and one was made payable to the LLC. Although the Debtor was not a member of the LLC, he admitted depositing both of these checks into his personal account.

Those acts were adequate (particularly under the "frivolous" standard discussed below) to give arguable support to an allegation of embezzlement or larceny under 11 U.S.C. § 523(a)(4) as pleaded in Count I. *In re Weber*, 892 F.2d 534, 539 (7th

Cir.1989) (embezzlement requires proof that the debtor appropriated funds for his or her benefit, and that debtor did so with fraudulent intent or deceit). *See also In re Rose,* 934 F.2d 901 (7th Cir.1991) (larceny requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent.)

Troost testified that the Debtor did not tell him about the deposits until confronted with copies of the cashed checks. The Debtor eventually returned the earnest money deposits but Troost estimated that the Debtor retained them from one to four months. That detention of funds might arguably justify a finding of conversion under 11 U.S.C. § 523(a)(6) as pleaded in Count III. *John Deere Co v. Broholm (In re Broholm),* 310 B.R. 864, 878 (Bankr. N.D.Ill.2004) ("A conversion has been defined as any unauthorized act, which deprives an owner of property permanently or for an indefinite period of time.")

Sanctions will therefore be denied under Bankruptcy Rule 9011(b)(3).

*Claims in the Second Amended Complaint were Arguably Warranted by Existing Law and were not Legally Frivolous*

■■ Paragraph 16 of the Second Amended Complaint states in part:

> On August 30, 2000, the Debtor ... orally misrepresented to Troost that the Office Building was worth $4 million with the intent of inducing Troost, Mt. Hope, and [the LLC] into accepting a proposal by Gateway to purchase the Office Building at the below-market price of $4 million.

The Debtor contends that Paragraph 16 is frivolous because it was not a representation or misrepresentation. The Debtor cites the Second Restatement for the proposition that a person is liable for a misrepresentation when the misrepresentation is made for the purpose of inducing another to act or refrain from action. The Debtor reasons that the alleged statement of value had no effect since Troost had already agreed to sell the Office Building at a contractually set price months before the alleged statement of value was made.

■■ Frivolousness of a pleading is determined by an objective inquiry into whether a party made or attorney made a reasonable inquiry into the facts and the law. *Brown v. Federation of State Medical Bds.,* 830 F.2d 1429, 1435 (7th Cir. 1987). The Debtor's argument depends on inferences derived from the underlying facts. Sanction motions are inappropriate vehicles to resolve facts based on the merits of the litigation. The Debtor's argument is not, moreover, a conclusion objectively compelled from the facts. A series of facts can be hypothesized from which the Debtor's intent to induce can be inferred.

A conspicuous fact emerging from the proceedings is the Debtor's significant conflict of interest. The Debtor held a fiduciary position with the seller of the Mokena Properties, the LLC. At the same time, the Debtor was the "attorney in fact" for the buyer, Gateway. The Debtor thus represented an interest adverse to the LLC, Troost, and Mount Hope.

The Debtor took several steps to ensure that the LLC sold the Office Building to Gateway including retaining Carroll Financial as a mortgage broker, contacting Binder to get an idea of the value of the Office Building and seeking joint financing from Success National Bank.

When Troost refused to sell to Gateway, it was not implausible in the eyes of Plaintiffs and their counsel that the Debtor might act or make statements to ensure that the Gateway would be the eventual

purchaser, as by statements painting the Gateway proposal in a favorable light or statements that would otherwise create a false impression. Such statements would induce Troost to maintain the contract rather than terminate the contract. There is therefore an adequate basis in fact to justify the allegations plead in Paragraph 16.

■■■ There is also an adequate basis in law to justify the allegations in Paragraph 16. To satisfy the frivolous clause a claim need only be colorable and contain a plausible view of the law. *Brown,* at 1435.

■■■ The mere absence of legal precedent, the presentation of an unreasonable legal argument, or the failure to prevail on the merits of a particular legal contention cannot justify a finding of frivolousness. *Lerch v. Boyer,* 929 F.Supp. 319 (N.D.Ind. 1996). A Seventh Circuit panel has stated that "one standard for frivolousness is risibility–if you start laughing when repeating the argument, then it's frivolous." *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 934 (7th Cir.1989) (en banc)

The alleged misrepresentation of value plead in Paragraph 16 also supports Counts I, 11 U.S.C. § 523(a)(4) and Counts II, 11 U.S.C. § 523(a)(2)(A). If Troost was enticed to maintain the Gateway contract based on the Debtor's alleged misrepresentations, that might establish a cognizable case of fraud under the Seventh Circuit's broad definition. *See McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000) ("Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dis-

sembling, and any unfair way by which another is cheated.")

It is therefore concluded that there was an adequate basis in the law and facts to support allegations pleaded in paragraph 16. That basis was more than laughable and supports the conclusion that Plaintiffs' attorney made sufficient reasonable inquiry into the law and facts. *Mars,* 880 F.2d at 928 (stating that a feeble position may demonstrate that the pre-filing investigation was unreasonable.)

### The Debtor Has Not Demonstrated that Plaintiffs Filed the Complaint for an Improper Purpose

■■■ The improper purpose clause, Rule 9011(b)(1) is directed at abusive litigation practices and encompasses papers filed to cause unnecessary delay, to increase litigation costs, or filed to harass. *Beeman v. Fiester,* 852 F.2d 206, 209 (7th Cir.1988) *overruled on other grounds; In re American Telecom Corp.,* 319 B.R. 857 (Bankr.N.D.Ill.2004).

■■■ In determining whether a paper has been submitted for an improper purpose, a court must make a subjective inquiry into why the petitioner pursued the litigation. *In re Collins,* 250 B.R. 645, 661 (Bankr.N.D.Ill.2000) (citing *Szabo,* 823 F.2d at 1083.) A paper interposed for any improper purpose is sanctionable whether or not it is supported by the facts and the law, and no matter how careful the pre-filing investigation.

■■■ The subjective component is akin to the tort of malicious prosecution; filing a colorable suit to harass, delay, or cause expense to the opponent. *Szabo,* 823 F.2d at 1083 (filing a colorable suit for the purpose of imposing expense on the defendant rather than for the purpose of winning); *Kapco Mfg. Co., Inc. v. C & O Enter., Inc.,* 886 F.2d 1485, 1491 (7th Cir.

1989); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.1985).

■ The Debtor contends that the Complaint was filed to harass the Debtor and Carmel Kitchin in the State Court Litigation and delay the Debtor's bankruptcy case. The Debtor points to the following as evidence of improper purpose: (1) Plaintiffs' initial complaint is the same complaint used in the state court litigation, (2) Plaintiffs repeatedly filed for extensions of time in which to object to dischargeability in the bankruptcy proceeding, and (3) Plaintiffs made minimal discovery efforts.

Given that the Second Amended Complaint has been held to have had some factual and legal support for purposes of Rule 9011, these circumstances do not suggest an improper purpose. The similarity of the Initial Complaint with that filed in related state court litigation and that of the Trustee does not compel a finding of improper purpose as long as the Complaint here contained colorable and nonfrivolous allegations. Further, although Plaintiffs repeatedly moved for extensions, other creditors, included the Trustee, also did so. Requests for continuances may well be pertinent to a claim of improper extension of litigation under 11 U.S.C. § 1927, but do not in this case show a malevolent or legally improper purpose in filing the suit.

Moreover, the Debtor did not produce specific evidence showing directly that Plaintiffs intentionally sought to delay the Debtor's bankruptcy case or to harass Debtor and his spouse. *See Jackson Nat'l Life Ins. Co. v. Greycliff Partners*, 226 B.R. 407, 421 (E.D.Wis.1998) (holding that movant's characterizations of improper purpose do not, by themselves, provide a basis for the imposition of sanctions).

In light of the lack of sufficient facts indicating improper purpose, sanctions will be denied under Bankruptcy Rule 9011(b)(1).

### Discretionary Authority under 11 U.S.C. § 105

■ Section 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process. It allows a bankruptcy judge to "issue any order ... appropriate to carry out the provisions" of Title 11 and "to prevent an abuse of process." 11 U.S.C. § 105. Section 105 encompasses the power to issue an order to sanction an attorney who multiplies proceedings unreasonably and vexatiously under the same circumstances and standards that would warrant sanctions under 28 U.S.C. § 1927. *See In re Volpert*, 110 F.3d 494, 501 (7th Cir.1997).

■ A sanctioning court, however, should ordinarily rely on available authority conferred by statutes and procedural rules, rather than its general or inherent power, if the available sources of authority would be adequate to serve the court's purposes. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1058–59 (7th Cir.1998).

Given that Fed. R. Bankr.P. 9011 and 28 U.S.C. § 1927 and recognized standards thereunder are more than sufficient to sanction any wrongful conduct that has been complained of, discretion will not need to be exercised under § 105. However, alternatively, under the teaching of *Volpert*, this Court has the same authority under § 105 as it asserts under 28 U.S.C. § 1927, and reaches the same determination under both provisions if lack of authority under 28 U.S.C. § 1927 is seen by a higher court.

*Authority of Bankruptcy Judge to Impose Sanctions under 28 U.S.C. § 1927*

Debtor also moves for sanctions under 28 U.S.C. § 1927, which provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Plaintiffs questions this Court's authority to impose sanctions under § 1927 citing *In re Volpert,* 110 F.3d 494 (7th Cir.1997.)

In the bankruptcy case of *Volpert v. Ellis (In re Volpert),* 177 B.R. 81 (Bankr.N.D.Ill.1995) (Schmetterer, J.) the Debtor also objected to a Bankruptcy Court's authority to impose sanctions pursuant to § 1927. At that time, the Seventh Circuit had not yet resolved the issue. The bankruptcy judge opinion, citing the jurisdictional scheme Congress enacted in response to *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), held that a bankruptcy court as a judicial officer of the District court may impose § 1927 sanctions as to a matter within its core jurisdiction. That holding was affirmed by the District Court. *See In re Volpert,* 186 B.R. 240 (N.D.Ill.1995).

A panel of the Seventh Circuit, however, declined in *Volpert* to affirm explicitly the imposition of sanctions under § 1927. Instead the Panel held that the language of § 105 furnishes bankruptcy courts with ample authority to sanction conduct that abuses the judicial process, including conduct that unreasonably and vexatiously multiplies bankruptcy proceedings. *In re Volpert,* 110 F.3d 494, 501 (7th Cir.1997).

That holding and opinion remained Circuit authority until *Adair v. Sherman,* 230 F.3d 890 (7th Cir.2000). In *Adair,* the Panel opinion found that a bankruptcy judge could sanction an attorney under authority of 28 U.S.C. § 1927. The opinion relied on *Volpert* as precedent. *Id.* at 895 n. 8.

Moreover, since a bankruptcy judge is a judicial officer of the District Court (28 U.S.C. § 151) and the District Court is undoubtedly a Court of the United States (28 U.S.C. § 451), § 1927 applies by its terms to give authority to the bankruptcy judge to whom all bankruptcy jurisdiction has been delegated under Local District Rule.

### Elements of § 1927

Attorneys may be sanctioned under § 1927 if they unreasonably and vexatiously multiply proceedings in any case. 28 U.S.C. § 1927. This statute permits a party to recoup fees and costs when an attorney acts in an objectively unreasonable manner and with either subjective or objective bad faith. *Kotsilieris v. Chalmers,* 966 F.2d 1181, 1184 (7th Cir.1992); *Alexander v. United States,* 121 F.3d 312, 316 (7th Cir.1997) (holding that sanctions are also appropriate when objectively unreasonable litigation-multiplying conduct continues despite a warning to desist.); *see, e.g., Ordower v. Feldman,* 826 F.2d 1569, 1574 (7th Cir.1987) (indicating that intentional ill will or reckless conduct constitutes vexatious conduct).

Although the use of § 1927 sanctions is penal in nature and should be construed strictly, *Indianapolis Colts v. Baltimore,* 775 F.2d 177, 182 (7th Cir. 1985), sanctions may be warranted in this case. Plaintiffs' counsel displayed laxity in prosecuting this Adversary, sought to ride on work of the Trustee in a separate case, dragged out the pleading process thus

causing more expensive litigation, and obstructed discovery.

### Plaintiffs' Unreasonable Multiplication of Proceedings

Plaintiffs filed their Initial Complaint on April 1, 2003. The Initial Complaint, seeking to deny discharge of debtor pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4), plead broad conclusory allegations of fraud in violation of Fed. R. Bankr.P. 7009(b). That Rule requires "in all averments of fraud ... the circumstances constituting fraud ... shall to be stated with particularity." Fed. R. Bankr.P. 7009(b).

Plaintiffs alleged that the Debtor engaged in fraud or defalcation while acting in a fiduciary capacity but provided no supporting allegations. *See Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990) ("To meet the particular requirement of Rule 9(b), a complaint must specify the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (holding that plaintiffs need to allege "who, what, when, where, and how" to properly plead a claim of fraud under Fed.R.Civ.P. 9(b)).

Furthermore, the Initial Complaint plead allegations based upon "information and belief." Such allegations did not satisfy Rule 7009 without an additional statement of facts detailing the basis for the belief. *See Olson v. Potter (In re Potter),* 88 B.R. 843 (Bankr.N.D.Ill.1988) (citing *Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983))("allegations of fraud based on information and belief do not satisfy the specificity requirement, unless accompanied by a statement of facts upon which the belief is founded.")

The failure of Plaintiffs to comply with Fed. R. Bankr.P. 7009(b) forced the Debtor to file a motion to dismiss. Plaintiffs choose to defend the validity of their Initial Complaint rather than amend it and a briefing schedule was set. Plaintiffs response to the Motion to Dismiss did not cure the Initial Complaint's infirmities and an Order was entered on Debtor's Motion striking the Initial Complaint pertaining to fraud but granting Plaintiffs leave to file an amended complaint.

Plaintiffs filed an Amended Complaint on August 19, 2003, again seeking the same relief. But Plaintiffs had failed to remedy the deficiencies originally identified by the Court and Debtor. Paragraphs 1–58 of the Amended Complaint remained virtually unchanged. The remaining allegations contained bare and generic statements of fraud which again did not satisfy Fed. R. Bankr.P. 7009(b).

The Amended Complaint also contained allegations relating to stolen expenses (Am.Compl.¶ 6), but Plaintiffs did not plead a cause of action for those expenses. Additionally, Plaintiffs did not specify in their prayer for relief the damages they were seeking from Counts I and II. Finally, the Amended Complaint contained a historical background consisting of argumentative pleadings and rhetorical flourishes. The Amended Complaint did not satisfy Rule 7008, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Bankr.P. 7008. *See Jennings v. Emry,* 910 F.2d 1434, 1436 (7th Cir.1990) (a complaint "must be presented with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search" of the plaintiff's claim). During oral argument on Debtor's Motion to Dismiss, Plaintiffs' counsel resisted the pleading requirements under Fed. R. Bankr.P. 7008 and 7009. (Tr. Nov. 10,

2003.) As a result, the Court *sua sponte* struck Counts I and II of the Amended Complaint, but again granted Plaintiffs leave to amend.

Plaintiffs filed a Second Amended Complaint on December 1, 2003. The Second Amended Complaint again sought to deny dischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6). Counts IV and V also alleged violations under § 727(a)(3) and (a)(5) to bar discharge. Debtor again moved to dismiss.

The Second Amended Complaint eliminated many of the defective allegations contained in the previous complaints thereby satisfying Rules 7008, 7009, and 7012(b)(6). An Order was then entered denying Debtor's Motion to Dismiss. However, the Second Amended Complaint still contained many pleadings so vague and ambiguous that "the Debtor could not reasonably be required to·form a responsive pleading thereto." (*See* Order, January 7, 2004.) The Court therefore *sua sponte* required Plaintiffs to file a More Definite Statement as to the allegations in Paragraphs 16 and 17, relating to the Debtor's misrepresentation of the value of the Office Building. *See* Fed. R. Bankr.P. 7012(e).

Paragraph 16 alleged that the Debtor represented that the Office Building was worth $4 million knowing that it was worth far more that amount. (Second Am. Compl. ¶ 16.) To support these allegations, Plaintiffs' More Definite Statement cited an appraisal prepared on October 29, 1996, four years prior to the alleged misrepresentation. (Def.'s Ex. 19.) That appraisal indicated that the value of the Office Building at that time was $4.8 million. Plaintiffs also cited the $7.7 million purchase price of the Office Building and Plaza in 1998 and that the Plaza had been sold for $3.2 million in 2000. Plaintiffs did not cite any direct evidence of the value of the Office Building at the time of the Debtor's alleged misrepresentation. Instead, Plaintiffs argued that future discovery and expert opinions would reveal this information.

Paragraph 17 alleged that:

"the Debtor made the material misrepresentations regarding the value of the Office Building ... with the knowledge that they were false ... when, in fact, the Gateway entity was a front for the Debtor himself and a $4 million was a below-market price for the Office Building."

To support the allegations plead in Paragraph 17, the More Definite Statement alleged several facts suggesting Gateway was a front for the Debtor. Plaintiffs stated that the original address recorded for Gateway by the Illinois Secretary of State is the address of Debtor's attorney and the Gateway annual report for the year 2000 lists the Debtor's close personal friend, Danahy, as Gateway's only officer and director. Plaintiffs further alleged that CII, the entity controlled by the Debtor through a general power of attorney over his wife, Carmel Kitchin, paid the earnest money for Gateway's purchase of the Office Building. Finally, Plaintiffs alleged that Danahy held a bank account in trust for Carmel Kitchin.

Plaintiffs' More Definite Statement contained sufficient information to allow the Debtor to plead a responsive answer. *See* 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 3d* § 1378 (2004) (explaining that Rule 12(e) is satisfied when a party furnishes enough details to allow a responsive pleading.). However, the information contained in the More Definite Statement appears to have been copied from Plaintiffs' Complaint in the state court litigation. (*See* Def.'s Ex. 14.) That information could have been pleaded in the initial Adversary Complaint

or later Amended Complaint without requiring an order for the More Definite Statement. Plaintiffs thereby unreasonably and unnecessarily extended the filing of pleadings and responsive pleadings over nearly nine months of expensive and wasted efforts.

### Plaintiffs' Lack of Discovery and Obstruction of Defendant's Discovery

On January 6, 2003, the Debtor's Chapter 7 Trustee filed an Amended Complaint against the Debtor seeking to bar the discharge of debt alleged owed pursuant to 11 U.S.C. §§ 727(a)(3), (a)(5), and (a)(2)(A) ("Trustee's Complaint"). Plaintiffs' Second Amended Complaint and the Trustee's Complaint contained similar factual allegations and similar Counts. Although Plaintiffs' counsel argued that the Trustee copied its state court complaint, its counsel conceded that Plaintiffs litigation strategy in this Adversary was to follow the Trustee's lead. (*See* Pls.' Sanctions Mot. Resp. at 13; Def.'s Ex. 20 at 18.)

The end result was that the Trustee conducted the bulk of discovery, while Plaintiffs engaged in minimal discovery efforts. Plaintiffs did not propound interrogatories, requests for production, requests to admit, or any written discovery. Plaintiffs failed to provide responses to certain written discovery propounded by the Debtor.

Plaintiffs' litigation strategy further required the Debtor to file several motions to compel discovery. On April 6, 2004 the Debtors filed a motion to compel Mr. Brown (Troost's and Mount Hope's attorney) to produce documents. (See Debtor's Mot. to Compel, April 6, 2004.) The Debtors alleged that Brown failed to produce subpoenaed documents and failed to contact Debtor's counsel regarding the subpoena. (*Id.* at 11–12.) An Agreed Order was subsequently entered ordering Brown to produce all documents responsive to the

Subpoena. (Agreed Order Scheduling Production of Documents, April 12, 2004.)

On May 5, 2004 the Debtor filed a Motion to Compel Plaintiffs to Amend Certain Answers to First Request for Admissions and for Sanctions. That Motion demonstrated that Plaintiffs failed to provide adequate responses to Requests to Admit propounded by the Debtor.

In addition to piggybacking off of the Trustee's discovery efforts, Plaintiffs were uncooperative. Plaintiffs' counsel failed to control the unruly conduct of their primary witness, Brown, during his deposition, thereby forcing Debtor to file still another motion. (*See* Debtor's Mot. to Compel Deposition Testimony From Kenneth Brown, Esquire and For Sanctions, May 4, 2004.) In support of that Motion, the Debtor cited Brown's disruptive conduct during his deposition including Brown's refusal to answer questions; that he raised evidentiary objections and questioned the techniques of the interrogator; answered his cell phone during the deposition; and attempted to control the scope and manner of the deposition. (*Id.* Ex. A.) As a result of Brown's conduct, Debtor's counsel terminated the deposition and filed a motion to compel. The Debtor sought entry of an order compelling Brown to sit for the duration of his deposition; for an order instructing Brown to provide answers to deposition questions and for sanctions against Brown for his refusal to participate in his deposition. (*See* Motion to Compel Deposition Testimony From Kenneth Brown, Esquire and For Sanctions ¶ 1 at 2.) All of this happened on the eve of trial.

During the discovery period, the Trustee settled its litigation with the Debtor. (Order, April 5, 2004.) Rather than respond to pending discovery motions in this case, Plaintiffs requested that all discovery immediately cease and voluntarily dismissed this Adversary.

The principle underlying § 1927 is that in a system requiring each party to bear its own costs and fees, courts must ensure that each party really does bear the costs and does not foist expenses off on its adversaries. *In re TCI Ltd.*, 769 F.2d at 441. Instead of actively prosecuting their case, Plaintiffs relied on the Trustee's efforts. In doing so and also adopting a tactic of delaying this case and making defense preparations more difficult, they imposed considerable cost and expense on the Debtor that should have been unnecessary.

One such cost was the research required to investigate and respond to Plaintiffs' original and amended Complaints. Plaintiffs' failure to plead within the requirements of the Rules of Bankruptcy Procedure forced the Debtor to file no less than three motions to dismiss as well as responsive briefs relating to those motions, forced the Court to require a more definite statement, and required the Debtor to file a responsive brief to the More Definite Statement.

Plaintiffs uncooperative discovery tactics imposed yet another cost on the Debtor. Plaintiffs resisted disclosure and did not control its witness, requiring the Debtor to file several discovery motions. When a party recklessly creates needless costs the other side is entitled to relief. *TCI Ltd.*, at 446.

Based on the foregoing, it must be concluded that the Debtor has established a prima facie case under § 1927.

A hearing will be set by separate order for the Debtor to prove-up costs and fees incurred in this Adversary that relate to undue extension of litigation caused in this Adversary by Plaintiffs' counsel. Further hearing will be held to determine whether such costs should be imposed against Plaintiffs' counsel. Section 1927

sanctions can only be imposed on counsel in the case, not on a client or person not admitted to conduct cases in the court. *See* 28 U.S.C. § 1927 ("any attorney or other person admitted to conduct cases in any court of the United States … may be required by the court to satisfy … costs, expenses, and attorneys' fees.")

### CONCLUSION

Sanctions pursuant to Bankruptcy Rule 9011 will be denied for reasons discussed above.

A separate order will be entered setting a further hearing under 28 U.S.C. § 1927 or alternatively 11 U.S.C. § 105. Defendant will be ordered to detail costs and litigation expenses directly caused by the conduct of Plaintiffs' counsel that has duly extended the litigation, and Plaintiffs' counsel may contest those and offer further evidence opposing the possible sanctions at a further hearing to be scheduled.